We are now ready for our final case of the day, State of Georgia v. President of the United States. Counsel, are you ready? Good morning, Your Honors, and may it please the Court. Joshua Revesz for the United States. The Procurement Act authorizes the President to prescribe policies he considers necessary to ensure an economic and efficient system for contracting. Pursuant to that authority, the President issued an executive order requiring agencies to contract only with those entities that take appropriate safeguards to protect their workers from COVID-19. That order, and the OMB determination implementing it, fall well within the Procurement Act's text, and the decades-long understanding of that statute by the Federal Courts, Congress, and the Executive Branch. The District Court, therefore, erred in enjoining the policy nationwide. So I'll start with the text and precedents on the Procurement Act, and I'll try to leave some time at the end to discuss the injunction's overbroad scope. And in our view, this is a case that's really governed— I'll try to leave a good bit of time for the question of how broad the injunction ought to be. Absolutely, Your Honor. But let me just start with the two statutory provisions that, in our view, govern this case. You know, Section 121 of 40 U.S.C. authorizes the President to prescribe policies and directives that the President considers necessary to carry out this subtitle. And Section 101 explains what policies are necessary to carry out the Procurement Act. Policies that provide the Federal Government with an economical and efficient system for procuring and supplying property and non-personal services and performing related functions, including contracting— Do we ordinarily interpret purpose sections of statutes to convey authority? So ordinarily not, and we're not contending that the purpose statute conveys authority. You know, it's Section 121, which says the President may prescribe policies and directives that the President considers necessary to carry out this subtitle. That's what conveys the authority. And in deciding what's within the scope of that authority, the Courts of Appeals have looked to the purpose of the Procurement Act because it's difficult to see how well support would know what's necessary to carry out the subtitle. How correct do you have to be before the District Court has abused its discretion? It's not that I think the government's case is no good. It's just that I don't think these people's case is no good either. So then we get into reviewing for abuse of discretion. How powerful do you have to be before we are justified in overruling the District Court? So the standard for review of a preliminary injunction is abuse of discretion, but any error of law is an abuse of discretion. So I think if this Court thinks that the best reading of this statutory text is that the Procurement Act authorizes the challenged order, then the Court should reverse. So surely you don't think we have to resolve the merits of this case in order to decide whether this preliminary injunction was properly issued? The question for this Court is whether plaintiffs are likely to succeed on the merits. But in deciding whether plaintiffs are likely to succeed on the merits, the District Court made a number of statements about the Procurement Act's reach and this executive order and whether it falls within that. And if those statements are errors of law and it's our contention that they are, then the District Court's injunction should be reversed. And that's before considering the equitable factors, you know, which is abuse of discretion review. I hear that position and I think that's the one you have to take. So good plan. But my story is different. My story is we have a statute that the Supreme Court has not construed, at least in this kind of context, and which our Court has never construed, at least in this kind of context. We have another circuit, the Sixth Circuit, which has said that a case similar to this one, similar to this one, was properly a basis for a preliminary injunction. It seems to me that once we look at this case and we can say it's hard, then there's no abuse of discretion. I don't have to say it's hard, and furthermore, I think the government's right. I mean, it's just hard. You know, so if you come to think the government is right, and I'll try to persuade you that the government is. And you might get, but it seems doubtful. I don't think there's any precedent that says that, you know, you defer to a district court's understanding of the law on review of a preliminary injunction, as opposed to its understanding of the weighing of the equities and so on. So I do think this is essentially a pure legal case for this Court on whether the Procurement Act, as properly construed, authorizes this executive order. Isn't that support, your point there, supported at least impliedly by the fact that in so many of these COVID-related cases where we've been dealing with preliminary injunctions or stays, and there have been legal issues at play, circuit courts have often interpreted the legal question as part of their review, and the Supreme Court, upon further review, has not, that I know of, criticized that approach. No, I think that's right, and I think that's often the way preliminary injunctions appeals work, not just in this context, but in other contexts. You know, often the Court of Appeals will start with the law and will decide what they think the Court thinks the best meaning of the law is. And here, the best meaning of the law, in our view, you know, is the understanding of decades and decades of decisions of the Courts of Appeals. You know, this Court's predecessor mentioned it briefly in the Farkas case, but there— Didn't it also mention it in the New Orleans case? I'll dig out from my pile. United States v. New Orleans Public Service. Are you familiar with that case? I think so, but I'm not sure. 553 F. 2nd 459 from 1977. And I think it was a brief mention of the Procurement Act in that case, if I'm recalling correctly. I'd say probably more than brief. They were discussing the issue, and it said they were discussing potential sources of legislative authorization for, I believe, the nondiscrimination—one of the nondiscrimination executive orders. And in that case, as I read it at least, the Court certainly referenced decisions basing the justification in executive orders under the Procurement Act. But it also said the second source of legislative authorization is Title VII of the Civil Rights Act. So it seems to me that our precedent—the closest precedent I could find in our circuit, since we're bound by Fifth Circuit cases before the split, is that there were two sources of authorization for that order. So there were a number of antidiscrimination executive orders, and some of them predated Title VII and some of them postdated Title VII. And in one of the Third Circuit antidiscrimination cases, plaintiffs actually argued that the executive order transgressed Title VII because it was broader in certain respects to post Title VII executive order. So, you know, the history of the antidiscrimination orders is complicated, and I'm happy to talk about that. But, you know, I do think what's relevant is that every court of appeals, to my knowledge, upheld those antidiscrimination orders. The courts of appeals upheld the price-fixing orders of the 70s. The courts upheld the E-Verify order in the 2000s. You know, these are all uses of the Procurement Act to involve the executive branch in issues that at those times were extremely controversial, and those orders were all upheld. And I think that goes to our reenactment argument, because Congress, knowing of that backdrop, reenacted the Procurement Act without change and noting in legislative history that it meant to carry forward the judicial decisions interpreting that statute. Yeah, but the D.C. Circuit, which I guess the Kahn case is your best case—I'm not saying it's your only case, but your best case—but even there, they say, yes, but don't read our opinion as saying that the president can do whatever he wishes, which only means to me we're back where we are. And it's not our position that the president can do whatever he wishes. You know, it's our position that there needs to be a close nexus between the challenged order and economy and efficiency, and there was in Kahn, as the Court there explained, and we think there is here. We're not trying to tell the Court there are these precedents, just cite the precedents and reverse the district court. We think that the Court needs to do an economy and efficiency analysis. We think that— This is where we get back to the point that you and I were talking about to begin with. It's not that I think that your side is wrong. It's not plain to me that your side is right, and that I think that that is enough to say there's been no abuse of discretion. I guess I would just say that if the Court comes to think that we are right on the merits, this order is authorized by the Procurement Act, as that text is best understood, then the Court should vacate the preliminary injunction. I'm not aware of any precedent saying, you know, if each— I agree with that, but you see, I don't think you have the powerful cases that, as an advocate, you are advancing. I do—I mean, I think the cases say stuff you say they say. I think they're out there, and yeah. But they're not really exactly that close, given the health issues here. And so therefore, I think, yeah, you may win this case. Supreme Court may go with the government on down the road. I wouldn't be surprised. I wouldn't say I'm shocked. But I won't be surprised if, at the end of the day, the other side wins this case either. And I thought that was, at the preliminary injunction stage, the question I'm supposed to be thinking about. So that's not our understanding of the preliminary injunction standard. I think the question is, what's the best reading of the law? And I think we do have some very powerful things on our side. You know, the first thing we have on our side is some very broad text authorizing the President to do what he considers necessary to ensure economy and efficiency in contracting. You know, the other— So it's a peculiar statute. There aren't really substantive provisions that Congress seems to have intended the President to carry out. And I think that's partly why, you know, all of the courts of appeals, you know, from And, you know, this is only a power to direct agencies. I do think this is important. This is not a regulatory power to, you know, coercively regulate the citizens at large. All the President has done here is told his own agencies, you know, the subordinates to him in the executive branch, when you make contracts, you may make contracts only with certain businesses. And it's not surprising the President has that power. I mean, that power may even be inherent in our system of government, but it certainly is conferred to him by the Procurement Act. Right. So you specifically not relied on any inherent authority in this case, right? So the President relied both on his constitutional and his statutory authority in promulgating the order. You know, we think we're going to win or lose this case on the Procurement Act. We have not made a standalone Article II argument. But I think the Article II backdrop is important in a variety of respects here. It's important in interpreting the Procurement Act and explaining why Congress would have wanted the President to be able to direct agencies as he wanted. You know, it's important in thinking about some of the constitutional and quasi-constitutional arguments that plaintiffs have brought to this case. I do think it matters that this is just a statute that allows the President to tell his own agencies what he thinks they should do. Could he, would you argue that that authority existed if there were a statute from Congress that said that the President could not do that? No, that would be very different. That would be, you know, the other kind of Youngstown case. So you are trying to put this in the Youngstown bucket, although I thought that you had said that you didn't plan to do that for purposes of this case. You know, I think, we think that the Court should look at the text of the Procurement Act and should decide what the best meaning of that text is. We're not arguing that the Court should, you know, say regardless of the Procurement Act, the government can win this case. But as to what the Procurement Act means is a question very much informed by the Article II backdrop, and I think we have made that argument in our briefs. And maybe I'll talk briefly about the Sixth Circuit State Panel decision that Judge Edmondson mentioned. You know, the logic of that decision is that the word system in the text of the Procurement Act disables the executive branch, or excuse me, the president, from telling agencies that they can only contract with certain contractors. And we just don't think that's right as a matter of ordinary meaning. And we think the example that Georgia gives in its brief actually proves that point very well. You know, a system for procuring groceries is the example they give. And if one grocery executive said to another, we need a system for procuring groceries to be economical and efficient, and that means we're going to stop purchasing from suppliers that don't meet our quality control. I think everyone would think that that's a normal way to create an efficient system for procuring groceries. And this is no different. When the president tells agencies, in executing contracts, contract only with suppliers that have adequate quality control in this, you know, in this area, the president is saying— Is it—given the breadth of the order, is it—is it fair to say that this is about quality control of the items the government needs? I think a lot of these contracts are, say, for research and things like that. Does it really matter to the end work product of the government whether the person sitting three doors down from the researcher is also vaccinated against COVID? It does, Your Honor. So the executive order doesn't apply to grants, so let's just set grants aside. You know, when the government procures goods and services, it absolutely matters whether those goods and services are delayed. And that was the logic of the acting OMB director in reaching her determination that requiring vaccination improved economy and efficiency in the federal workforce. You know, when federal contractors are getting sick and when they're infecting their co-workers with a virus, you know, things move more slowly. And the government ultimately bears that cost. And sometimes the government bears that cost directly in sick leave costs for certain contracts, but more often the government will bear that cost indirectly through delays in lower quality work. And it was entirely within the president's authority to say that is the kind of delay that I want to address under the Procurement Act. You've indicated, moving on to the injunction, if my colleagues don't have any more questions right now before we run out of time, you've indicated that you think only a few of the parties have submitted evidence sufficient to show standing. You say that the injunction should only go toward those parties. As I am looking for my chart, which I can't find, but it seemed that more evidence had been offered by several of the parties about different contracts that they, different things they planned to bid on or the fact that they regularly bid. What type of evidence precisely do you think is necessary to support standing for the purposes of a PI? You know, so our frontline argument, so we're not contesting that there is standing in this court, and this court is Article III jurisdiction to decide the preliminary injunction. As to the scope of relief, our most fundamental argument is that entities that are not parties to this court should not benefit from any injunction, to this lawsuit should not benefit from any injunction issued by the district court. You know, our secondary argument is that injunctive relief should go only as broad as entities that have demonstrated standing before the district court. The district court specifically found that only three entities had standing, Georgia and two ABC contractors. Is that right? You know, I would have thought that standing, first of all, I really actually thought that the court said that there was an alternative basis for standing, which has to do with the fact that these people have a course, these people being Kansas, but these states and their course of dealing, which involves contracting and so forth, and they say they're going to continue it in the future. They've made plausible representations that they intend to deal with the government in the future. I also thought, by the way, that there's something in the record about some of these states have been told that some of their contracts are going to be mandatorily adjusted in the future. Is that so? The last part, the last part being, is that so they've been told some of them are going to be mandatorily adjusted? So in the last question, Judge Edmonton, the executive order does not require agencies to modify existing contracts. Some agencies do have contracts where they have previously negotiated a clause saying, and by the way, we can unilaterally modify that contract at any time. And the executive order encourages agencies to consider whether to exercise that authority to include a COVID-19 safety clause. And some of them have already, some of these plaintiffs have already been notified that they have contracts that will be modified. Is that correct? I think that's right. We don't think that's traceable to the executive order because it's not a requirement of the executive order, but I think that's right on the facts. Okay. So let's assume for the sake of our discussion now that there's going to be some kind of preliminary injunction. I do not know that's so. We haven't conferred. I don't know. But let's assume that there is. You are flatly opposed to the universal injunction, and I think I understand why. The issue for me is between these three and all parties, all parties. And I actually thought all parties was okay because I thought there was in the record and in the order statements to the effect that these people, these entities had courses of dealings and contemplate continuing that course of dealing in the future. And I thought that would be enough for standing anyway. You know, so we think what the court should say is all parties with standing. We don't think this court needs to do a standing analysis, which was not really, you know, briefed on these papers. We think the district court can figure that out. And it may well be that the district will ultimately conclude that all of the parties to this case have standing and so should benefit from the preliminary injunction. Our legal contention is that if a party does not have standing, it should not benefit from the injunction just because, you know, it's agglomerated into a lawsuit with other parties that do have standing. If I were at the Business Association, I might say, won't I be disadvantaged in the contracting process if the government knows that it cannot apply its preferred contract term to me, but it can to everyone else who's competing? Well, I think a proper injunction would bar the government from considering kind of an entity's legal ability to include a COVID-19 vaccination clause in deciding who should receive a contract. I think that that is necessary to give the plaintiffs complete relief. You know, on the subject of the association, we also think it's important that ABC members agree to be bound by this litigation in order to benefit from an injunction in this litigation. We don't think that, you know, the members should be able to not be bound by this litigation and sue us in other courts in case this litigation ultimately comes out our way. So I see I'm over my time, and I'm happy to sit down. Thank you. You'll retain the rest of your rebuttal time since you're answering our questions. Counsel for the State of Georgia, whenever you are ready. Thank you, Your Honor. May it please the Court. Stephen Petrani for the State Plaintiffs. The President does not have the authority to unilaterally impose a vaccine mandate on a fifth of the nation's workforce. The text of the Procurement Act provides him a benign, essentially residual authority to help the GSA to create a system for the government's own processes. It does not give him a wide-ranging authority to impose social and health policy by commandeering the internal operations of federal contractors. And if there were any doubt in the text, although there shouldn't be, there are numerous canons of interpretation, including the major questions doctrine, that would confirm as much. Do you think it's fair to say that this regulation commandeers the internal operations? Certainly a company who did not wish to have that policy could forego bidding on federal contracts. Well, I think it's both a legal and a practical matter. That's not right, Your Honor. As a practical matter, to just use one example, Georgia Tech gets a third of its revenue from federal contracts, over $600 million a year. The idea that Georgia Tech can just walk away from that is, I think, naive at best. It's sort of a case in point of Chief Justice Roberts' notion in NFIB, the proverbial gun to the head. Georgia Tech has to comply. There's really no other option for them. And is that, to be clear, is that federal contracts versus federal grants? I think that distinction was raised by the United States in argument. Is what federal? I'm sorry, Your Honor. Is one-third of Georgia Tech's funding from federal contracts versus federal grants? Is there some relevant distinction there? Well, so my understanding is that it's, I would have to check, Your Honor. I didn't see that the federal government ever contested that this was federal contracting money. I would have to double check on that. But either way, I mean, I don't think it actually makes a difference. Either way, there's hundreds of millions of dollars of federal contracts that issue both Georgia Tech, Alabama submitted evidence on this, Idaho submitted evidence on this. But even setting that aside, as a legal matter, the President doesn't sort of gain some authority he wouldn't have had otherwise simply because it's in the contracting realm. And I think if you look at the text of the Procurement Act, as Your Honor was suggesting, it grants the President the power to, you know, to carry out this subtitle. But this subtitle is the creation of the GSA. It's essentially saying, you know, the GSA isn't an independent agency. The President retains ultimate authority. But the government hasn't even tried to identify some substantive or operative provision that they're carrying out. Instead, they point to this purpose statement. But even there, even if you're going to rely on a purpose statement as some sort of affirmative grant of authority, this purpose statement, if anything, limits the authority. It makes clear when it lists the activities, these are all internal facing, you know, federal government operational activities like disposal of property, inspection, maintenance, storage. So when it says, you know, the purpose is to create an efficient system for the federal government to do these things, it's not saying, oh, what you're supposed to do is actually handle the storage or actually do the contracting. It's saying we need a system for these things. And if you look at what the Procurement Act came out of, which was post-World War II concerns about redundancy in contracting, you know, agencies not talking to one another and so forth, the creation of the GSA makes a lot of sense. Reading that to be some sort of grant of authority that allows the President to sort of run past the entire edifice of federal contracting law. And there's a really big edifice. So I don't want to interrupt you, but I want to make sure we have time. I'm not saying that this is your case, but in this hypothetical, couldn't a system of effective contracting say, government, you are restricted to contracting with this set of parties that has a proven record of getting goods delivered on time, but not with parties that have a proven record of getting goods delivered six months late? Why wouldn't that be part of a system of contracting? Well, so I think really what that would be is just the contracting itself. And even there, you're basing it on, you know, past performance. It probably, by the way, would violate other aspects of the federal contracting scheme, the Competition and Contracting Act, and so forth. But even setting that aside, I don't think that really goes to system. Just to use an example, if I told someone, I need your help setting up my system for accounting, I don't think that they would mean, or take that to mean, I need you to do my accounting for me. I think they would take it to mean the overarching kind of processes and so forth. How is this similar to doing the accounting? I'm not sure I'm following that. Yeah, so here, the government is saying that because the Procurement Act talks about an system for contracting, that means that the President can demand that certain, that actually even goes further than this, not only demand, basically, here's what the contracts should look like, but demand, here's what you should do in your own internal operations, even though the contract is for, you know, 20 widgets by x date. But we want you to go beyond that and do these other things, too. And even if system could be read both ways, there are other indications in the text, that suggest that there is no broad power here to just control all aspects of federal contractors' operations. And there are also canons of construction that I think very much would eliminate that as an option, especially given that the government has not identified any limiting principle on this power. What are the provisions of the text? So a couple that I would point to. The first is when it lists the related activities, I think, you know, a word is known by the company it keeps. These are all internal facing things. So I don't think we should read the term contracting to be this broad, you know, kind of outwardly facing thing, as opposed to, as the Sixth Circuit looked at it, and, you know, very persuasively explained, when we're, normally when we talk about contracting, we're talking about, you know, entering into contracts, not managing the performance of contracts or something like that. You're talking about a direct rather than an indirect effect, right? Because this order doesn't actually apply to any contractors. It applies to the government and says, you need to have this term in your contract with whomever the contract is, is the party. Well, I think as a substantive matter, what it's demanding is that federal contractors do a certain thing. I mean, yes, via the operation of putting this into your contract, but it's still demanding that they do that certain thing. And they can't, again, as I was discussing earlier, they can't just drop their federal contracts and not do this thing. They have to try to comply with that. But I'd also add another point. When anything the government says the president can do, the government is saying the head of the GSA can do. So in Section 121C, the head of the GSA has the same, if not greater authority than the president has. And I think that it just goes beyond common sense to say that this rather awesome power that the government is ascribing to the president is also present in the GSA. That the GSA could, on its own, determine, well, we think that a certain type of health policy is a good health policy. So we're going to impose that on all federal contractors. That argument would be a lot harder to sustain if we were bound by Khan and Chao, right? Which part of the argument? I'm sorry, I don't quite understand. It seems that both of those cases from the D.C. Circuit have a pretty, the concurrence is narrowing attempts aside. It seems to me that both of those cases have a pretty strong view of the breadth of the president's authority to do things that are not directly related to creating the sort of system of contracting that you're describing. Yes, so Your Honor, I want to be clear about this. We have two alternative arguments. One is that Khan, which is essentially the only case that has held what the government wants this court to hold, which is to go beyond the text and create some sort of close nexus requirement. We think that decision was wrong, but even under Khan, our second argument would be that it has to be a genuinely close nexus. It has to be something that's, you know, again, to just point to how the Sixth Circuit described it as a sort of like generally work-related kind of very, you know, business oriented operation. If you go beyond that, you get to a point where genuinely I'm not sure what the federal government thinks the president can't do under the statute. One of the, the district court found there was no power under a variety of theories. One of which is just looking at the statute head on, it's not good enough. And then it talks about the major power, it's not good enough. It goes through a variety of things. I want to talk to you, though, about if we were to adopt your principal argument about systems, would that make Khan and would it make those cases from the Fifth Circuit that at least talk about, talk about the anti-racial segregation? Would those cases just all be wrong? So, actually, I think this is a very important point, Your Honor. The anti-discrimination cases, no, I don't think that this really affects those. And one of the things I wanted to point out is the government has been kind of telling this story that the Procurement Act is what was sort of standing those orders up. But the president didn't rely on the Procurement Act in those orders. In fact, they both predated and postdated the Procurement Act, and they didn't cite the Procurement Act. And, in fact, if the Procurement Act were as broad as the government says it is, you think the president would cite those. I think it's much more likely that the president's authority to issue those orders comes more out of the civil rights statutes than it does out of... Well, Your Honor, I have read those cases this week, and I thought that they actually maybe said some alternative things, like, well, it could be based upon this, but it could have also been based upon the procurement authority. And then you still get into arguments about, well, was that dicta or was it not? But I'm trying to get over too much lawyering about dicta and whatnot and talk about, rather, if you're right, then those cases would be wrong to whatever degree they are relying upon the Procurement Act. Yes, so I do think that was clearly... The cases, as clearly dicta, they did not hold that the Procurement Act is what's supporting it. And, yes, to the extent that in dicta they suggested that the Procurement Act is sort of this font of kind of social policy for the president to impose, I think that that's incorrect. I don't think the Procurement Act is sort of a backstop for the president to do with a fifth of the nation's workforce, what Congress has not chosen to do with all of the nation's workforce. Are you familiar with a case called Chrysler Corporation v. Brown? It's a Supreme Court case, 441 U.S. 281 from 1979. I don't think I saw it cited in any party's brief, but in footnote 34 of that case, the Supreme Court discussing employment discrimination regulation says, the act explicitly authorizes executive orders necessary to effectuate its provisions. However, nowhere in the act is there a specific reference to employment discrimination. And it goes on to discuss the particular dual fonts of authority. Are you familiar with that case? Your Honor, I apologize. I'm not familiar with that case as far as I know that hasn't been cited. But what I want to get across is the president has lots of authority under a lot of statutes. Agencies have plenty of authority under contracting statutes to get what they need, to get it needed through the Competition and Contracting Act, the FAR, and so forth. We're talking about just one little aspect of one statute. This does not necessarily reach beyond, you know, this case to every time that the president has tried to impose some sort of legal requirement on contractors. We're just talking about a time where it's essentially, it's admitted that the president would not have this authority in any other way and is going well beyond any authority he's tried to impose in the past. Again, even going under the Kahn theory, the sort of close nexus theory, the president has only ever issued, until very recent years, exceedingly minimal orders that sort of go within the internal operations of contractors. Maybe the furthest he's gone was the price controls in Kahn. But even those were relatively minimal. It was, don't raise your prices too much. Don't raise your wages too much. And the D.C. Circuit said, you know, in a very contested decision, just because we're letting you do this doesn't mean you get to do anything you ever want. And most of the others— I disagree with you about it seems to me that this EO is a whole lot, has a whole lot closer connection to efficiency than did the anti-discrimination prior EOs or even the wage price prior EO. A proprietor naturally wants to have his work done efficiently. And it's entirely reasonable, in fact, it makes common sense and is consistent with common experience that if you're not vaccinated, there's a much greater chance that you're going to get sick and delay the work. So, it seems to me this has a very close nexus, much closer than all of the prior codes of appeal cases that have approved such EOs. So, Your Honor, I want to be clear. We're not suggesting that vaccines aren't good or effective, but there's a difference between vaccines and vaccine mandates. And the mere fact that if people got vaccines, that might help a company be more efficient is a far cry from, well, what happens when you have to start firing people because they refuse to get the vaccine? And it is a very indirect, attenuated sort of attempt to save the government money. You do not think this has a closer nexus than the anti-discrimination clauses requiring affirmative action, which went beyond Title VII? So, Your Honor, again, we're uncomfortable with the idea that the Procurement Act is what's providing the authority for those. But with that being said, at least in those cases, you can say, look, there was some kind of intransigence on the part of many employers to anti-discrimination law and so forth. At least as much as the intransigence, and we're talking about 1949. No, yes, exactly, Your Honor. And so the government at least has a reasonable theory that, you know, these companies might not be doing the efficient thing just because of non-efficiency considerations. There's really no sense of that here. I mean, the government points out— What if the government had evidence that since March, specific evidence, that since March of 2020, its contracts have been delayed, it has suffered millions of dollars in sick leave payments, it has had very specific consequences from a lack of vaccination, first before the vaccine was offered, and then second, from people choosing not to take it once it was available. Would that make a difference to the nexus argument? So I don't think it should. I think, if anything, it highlights how squishy this sort of nexus argument is. And if there's any concern here as to whether this would be possible, I think the major questions doctrine would say, no, Congress did not hand over this massive public health authority by accident. But I would also point out the government hasn't done any of that. They didn't put out any evidence below. They haven't identified a single product. They haven't gotten on time or a single, you know, late shipment due to COVID or something like that. And so I think, you know, the entire kind of premise of this notion that the government is going to come in in a one-size-fits-all kind of top-down, I'm going to tell everyone that this is the efficient way to run your business, is sort of just opposed to the entire contracting edifice that Congress has built up. The idea is that different firms doing different things bid and provide services as best as they can, and then the government chooses among them. And so the government repeatedly relies on this notion that a few private companies imposed vaccine mandates, much less strenuous than the governments, of course. They had exceptions for testing and so forth. So I actually hate to interrupt you, but I know you're running low on time. And I know we all want to, I think, discuss the scope of the injunction. As someone who's... Oh, of course. I do think that this involves a vast economical and political significance, that one prong of the major questions doctrine, because it affects a fifth of the workforce, perhaps. But it does not, it seems to me, meet that second or other prong that the Supreme Court has talked about, vast expansion of regulatory authority. Because in my judgment, this is a clearer exercise of that authority than any of the prior EOs about anti-discrimination and wage price and listing labor rights and so forth. This has a much closer connection. So I see no expansion of regulatory authority here. Well, Your Honor, I would have two points on that. One is, of course, for reasons I've already stated, I disagree on how close of a nexus this is. I think it's extremely attenuated. But also, I don't think that the Supreme Court has laid out this sort of expansion part that you're referring to as sort of some separate part of the test. And even if it is, this court has never held that the president under the Procurement Act has some degree of authority, just maybe not this much. I mean, as far as this court is concerned, especially given that it hasn't addressed this question before, this would be asking for a rather remarkable expansion. And I also think that given that the major questions doctrine is concerned with a sort of kind of practical question, did Congress give this amazing power without kind of being clear about it? I don't think the question is so much, well, is this logically consistent with past cases? It's a matter of, is this the sort of power, this power to impose health conditions on a fifth of the nation's workforce that Congress would give without being very clear about it? And if not, that tells you that that expansion of the statute to that power is not right under the text. And so you would then take that, I think, and look backwards and say, and so that might mean that, you know, a case here or there was maybe not right in dicta when it was talking about the Procurement Act. But I don't think that because a few courts, you know, like the D.C. Circuit basically have had a different view at some point, that that means the major questions doctrine doesn't apply. I see my time has expired. I'm happy to talk about the injunction if you would like. I have a few questions, actually. As someone who's spent a lot of time asking for nationwide injunctions in my past life, I certainly understand the impulse. But the district court's justification of the nationwide nature of this particular injunction was rather thin. Do you really think that that can be upheld in light of the demonstrated consequences in terms of squashing other litigation, not allowing, you know, the germination of the issue to come through the courts, as well as the courts not, the court putting our circuit's power over non-parties in areas where we're not generally in charge? So, Your Honor, my friend from the interveners will go into this more. But I would make a few points. The first is a nationwide injunction should be rare. But this is the rare case where it makes some degree of sense because this is national, this is national in scope in terms of contracting. If Georgia Tech bids on the same thing that Virginia Tech does, it's going to be very confusing if they're subject to separate legal regimes. Beyond that, I don't think there's any problem with the percolation of the law. It's currently on appeal in four different circuits. Here, the 6th, the 8th, and the 5th. And the federal government just declined to take an appeal from an Arizona case in the 9th Circuit. So the law is still going to be, you know, fleshed out. And then beyond that, which I will leave to my friend from the interveners, there are a lot of members of the intervener class. And so I think that this is that rare case where it would just be really complicated and difficult to understand how this was supposed to work if it didn't sort of apply to everyone. But would it be if the answer was just, and I guess I can mostly say this for your friend, but would it be complicated just to say that this contractual term doesn't apply to these parties? The reason I think it would still be complicated is what, you know, again, to go to the Georgia Tech versus Virginia Tech example, is the agency then going to be more inclined to give a, you know, a contract to Virginia Tech because they can enforce it against Virginia Tech and that's clearly what the president wants or something like that. So I think it would just, it would require needless sort of complexity. And so I think that's why this is one of the rare cases where it is, it is justified and we would ask the court to affirm. Thank you. Mr. Stein? Yes, Your Honor. May it please the court, I'm Larry Stein. I have the pleasure of representing the Associated Builder Contractors and I think rather than giving a presentation, I know y'all have questions on the scope. So we'd like to hear the questions and answer those correctly. I have a question. One of the problems with this kind of injunction is the idea of giving relief to people who have not asked for relief. But I wonder if it's not even, in this case, more than that. I do not know this. I suspect that there are contractors who support the government's position, that they're willing to be vaccinated. Their people are willing to be vaccinated. When they go on a job site, they would like for everybody else to be vaccinated. So we're not only are we, in a sense, giving relief that was not asked for, we may be giving relief that is affirmatively not desired. And that's a little troubling to me. And there's another scenario which is a little more arcane, but I will not retreat from. And that one is this. You have an employer who actually wishes everybody would be vaccinated. He knows he doesn't have the clout to get that done. These guys have been working for him for 50 years. They all started digging ditches at the same time. They don't do what he says just because he says it, even though he is the president. He wants everybody to be vaccinated. If the government will put that in a contract, he can go to his people and say, Bob, you know, every man for himself. But we've got to get this project. And they will not give me this project unless we're all vaccinated, giving him, as president of TOMS, more leverage. So I worry, we all know what the justices have said about universal injunctions. I'm not going to parrot any of that and let you think that I might possibly have thought that up on my own. I don't, first of all, those of you who know me would know that's not true. But second, you all know what those arguments are. But I do worry about the idea of giving relief to people who affirmatively don't want the relief. And at least it would be good to keep the injunction narrowed down to people who have yes, this is what we want. So that was a long question, but that's the question. It's a very long question. I'll see if I can answer it, Your Honor. First thing is the record is devoid of any information like that. The record that we developed and the one before the court is the one that the judge below had to deal with. The government chose not to put on any evidence. And in fact, the entire record of what they rely on is a grand total of two pages. So Associated Builder Contractors or ABC, we put forth three declarations, two very specific ones of Cajun and McKelvey saying we are federal contractors. We do it on a regular basis. We do it all the time. We've talked to our people and our people are telling us we're not going to get the vaccines and we don't know what to do because we're not going to have enough people to do the work to bid on it. Once that's a requirement, my clients won't bid on something I know they can't do if they don't have the suit. To his point, that applies to your clients. But if those other individuals or companies are concerned, then they could also file suit and get their own injection, right? Well, that is the problem. The problem is, of course, and it is noted in the findings of fact below that 57% of all the federal construction contract projects of $25 million, which means it's a good size project, were awarded to ABC members. We also put in Exhibit 4, which was a document that was coming from SAM.gov, which is the federal solicitations for federal contractors. At the time of the hearing, we were able to demonstrate there was already 100 contracts. Now there's over 400. But here's the problem for our point of view. We're going to be bidding on federal construction contracts, members of ABC, which we have standing under Greater Birmingham. So the contracting officer can react in one of two ways. One, we are not going to agree to this provision. The other ones are, so we're not going to be granted it. The government seems to concede that there needs to be some restriction on that. Or we're going to be able to bid it on a much greater confidence without the expenses and occurrence that will occur that we're having to get people vaccinated. We know we don't have to. And the other contractors will be at a disadvantage. It causes just chaos and confusion, which seems to be the standards. There's two things that we need in the standards. If you look at the Florida versus HHS case, which was recently decided, they lay out a couple of things that you look at. And one of them is look at the scope of the plaintiff. And the plaintiff is nationwide. There's no doubt about that. The judge may define in effect below that ABC's foundation has a nationwide coverage. We are in every state of the union. And I think you've answered my question. You're over time. Does anyone else have any questions? I have no further questions. Thank you for your time. Thank you, Your Honor. Just a very quick preliminary note that we are appealing the Arizona case. I think a notice of appeal should be filed today. You know, on my friend from Georgia's point that this is a benign, essentially residual power, I just think it's paramount in relevance that this is a statute that has been used to justify executive orders on a wide variety of very controversial political issues since the 1940s. You know, as you said, Judge Anderson, price fixing was very controversial at the time. E-Verify in the 2000s was very controversial at the time. And indeed, Congress barred the executive branch from requiring E-Verify of all private businesses. And yet the president still issued an executive order applying E-Verify to federal contractors under the Procurement Act. So we just don't think it's consistent with the history and with the understanding of Congress in reenacting the Procurement Act to think this is essentially a residual power that does nothing. You know, on the questions of whether this order advances economy and efficiency, Judge Anderson, I obviously agree with the way you put it, that it's a straightforward connection when fewer workers get sick, the government's work will be better done. You know, the main counterargument that Georgia has made and that the other plaintiffs have made is that it will not be efficient because so many workers will quit. You know, Georgia and the other states that are plaintiffs to this action told the Supreme Court in the CMS case that exactly the same thing would happen if the CMS mandate were allowed to come into effect. The Supreme Court apparently disagreed. The CMS mandate now has come into effect. And there are stories in every state, including Georgia, about how, you know, hospitals have been able to comply with the mandate. And in fact, very few workers have quit. We don't need that post hoc evidence to win this case because the OMB director reasonably concluded that workers would not quit based on the evidence available to her at the time. But, you know, her judgment has only become stronger since then. Obviously, one problem with a nationwide injunction affecting non-parties is that we don't know exactly how it would work out in the contractor context. But I think there's no basis to question the OMB director's determination on that point. You know, on limiting principles, I think we do have a number of important limiting principles to our position. The first is the close nexus argument. We think there has to be an economy and efficiency connection. You know, this is the president acting in his capacity as CEO of the executive branch. And it's very relevant to that inquiry, whether the requirements he imposes are something that a CEO might do. You know, as the acting OMB director noted in her determination, many private CEOs have decided that their businesses will be more efficient if a vaccine mandate is put in place. There's no reason that the president, in running the executive branch, cannot make the same efficiency judgment. Well, I thought the cases of private employers that you folks were talking about were cases, I'm not talking about legal cases, the instances, were instances where the private entity was enforcing a vaccination requirement on its employees, not a case where they were attempting or had enforced vaccination requirements on people who are contractors for them or whatever. So I think that's right, Judge Edmondson. I'm not aware of a company that imposed a contracting requirement on its own contractors. We don't have a square, I mean, a squarely analogous situation. It's not square, but I think it's very close. You know, those businesses think that if their employees are vaccinated, the businesses will run better. The federal government thinks that if others who do work for the federal government are vaccinated, the federal government's business will run better. I mean, I think that that really is quite analogous. The point is that a private employer, which the government is here as it is exercising a proprietary authority, a private employer could easily, and I suspect routinely do, we don't have any evidence of that, but a person that wants his work done quickly and not have any delays is very likely to say, I want your people, the people that are working on this project, I want them vaccinated. I think that's exactly right, Judge Anderson. And, you know, there are plenty of qualifications on workforces that get put in contracts all the time, and this is just one example of it. And I understand that it's a controversial example of it, but there have been controversial executive orders issued under the Procurement Act, you know, from the beginning of the statute, and that's never troubled Congress. And indeed, again, Congress did reenact the Procurement Act. So I think that the fact that it's been used from the beginning, the fact, as you say, Judge Anderson, that it's a proprietary power, this is not government regulation. This is government going into the marketplace in its capacity, you know, as a worker. Has the major question doctrine ever been applied in a proprietary exercise of authority? It has not, and indeed the Supreme Court declined to apply it in the recent CMS case. And we think that makes sense because the major questions doctrine is related, as Justice Gorsuch put it, to the non-delegation doctrine, which applies only when the government is seeking to regulate the liberty of Americans. There's no liberty right here to be a federal contractor. You know, this is simply a market-based, arm's-length transaction in which the question is, can the government insist on one clause? And there's no kind of major questions-related reason why the answer to that question would be no. You know, and as you say, another major questions, another component of the major questions cases is that the government is discovering an unheralded power in some deep recess of the federal bureaucracy. You know, this is power given to the President. We don't contend, by the way, that the GSA Administrator has analogous power, as my friend from Georgia suggested. And the President is the singular most accountable official in our system of government. The President has used this executive order, excuse me, this statute to promulgate a number of executive orders on controversial topics before. So this is not some sort of unheralded power that's being trotted out for the first time now in 2021. Has anybody ever held, upheld by anybody, any federal circuit court, ever upheld a procurement rule that touched upon health of workers before? You know, President Obama promulgated an executive order requiring that contractor employees be given sick leave. I don't believe it was ever challenged, but that's the closest analogy I have. That was a very good response. Let me try again. Has there ever been a procurement EO that, as a practical matter, required employees of contractors to do something medically? No, I don't think so. And there is no precedent that's that close, at least. There's no precedent that that's close. You know, there are executive orders that place requirements on who can do contractor work. You know, President Nixon put out an executive order saying that no contract work could be done by prisoners. You know, we've talked about the anti-discrimination orders, which I do think are relevant. But they were already prisoners or not, right? I mean, they couldn't quit being a prisoner. That's true, but I don't think... I guess they could become a prisoner. But that might be a reach to... And I know I'm out of time, so let me just try to respond to your question briefly. You know, I think if the President said, we want all contractor employers to maintain a security clearance, that would seem like a very straightforward exercise of the Procurement Act, even though it's something that employees have to stay in and, you know, periodically reapply for and so on. So I don't think the fact that it applies to current employees, as well as, you know, new hires, is what could possibly make a difference here. And so unless the Court has further questions, we just ask that the plenary injunction be vacated. Thank you. Thank you, Counsel. We appreciate all of your arguments today. This Court is adjourned. Thank you.